UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID F. KELLY BEY,                  :     CIVIL NO: 3:13-CV-01942
                                     :
            Plaintiff                :
                                     :     (Judge Caputo)
      v.                             :
                                     :     (Magistrate Judge Schwab)
DANIEL S. KEEN, *et al.,*             :
                                     :
            Defendants               :
                                     :

## REPORT AND RECOMMENDATION

## I. Introduction and Background.

The plaintiff, David F. Kelly Bey, began this action by filing a complaint on July 17, 2013.  Although he is now a prisoner at SCI-Rockview, Kelly Bey complains about events and conditions at the Franklin County Jail (FCJ).   He names as defendants the following four officials of the FCJ: Warden Daniel S. Keen, Deputy Warden Michelle Weller, Director of Treatment Jessica Sterner-Lensbower, and Chaplin Isaac Burkholder.  Kelly Bey claims that while he was a prisoner at the FCJ, the defendants denied him a diet that conformed to his religious beliefs.  He also complains about the FCJ not having a full-time Sunni Muslim Chaplin on staff.  He brings First Amendment Free Exercise and Establishment Clause claims as well as equal protection claims and claims under

the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§

2000cc–2000cc5.

On November 4, 2013, the defendants filed a motion to dismiss the

complaint and for summary judgment.  They also filed a statement of material

facts, a brief, and documents in support of their motion.  Kelly Bey was ordered to

file a brief in opposition to the motion, a counterstatement of material facts, and

any relevant evidence in opposition to the motion.  Kelly Bey requested and

received an extension of time until February 12, 2014, to file his opposition to the

defendants' motion, but he never filed anything in opposition to the motion.   For

the following reasons, we recommend that the defendants' motion to dismiss or for

summary judgment be granted.

## II.  Motion to Dismiss and Pleading Standards.

In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint

for "failure to state a claim upon which relief can be granted."  When reviewing a

motion to dismiss, "[w]e must accept all factual allegations in the complaint as

true, construe the complaint in the light favorable to the plaintiff, and ultimately

determine whether plaintiff may be entitled to relief under any reasonable reading

of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In

making that determination, we "consider only the complaint, exhibits attached to

the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir. 1994). A court,

3

however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010)(quoting *Iqbal,* 556 U.S. at 675 & 679).

A complaint filed by a *pro se* litigant is to be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). Nevertheless, "pro se litigants still must allege

sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). Thus, a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, a *pro se* complaint must recite factual allegations that are sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation, set forth in a "short and plain" statement of a cause of action.

## III. Summary Judgment Standard.

The defendants have moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes

over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.  A

dispute about a material fact is genuine only if there is a sufficient evidentiary

basis that would allow a reasonable fact finder to return a verdict for the non-

moving party. *Id.* at 248-49.  When "faced with a summary judgment motion, the

court must view the facts 'in the light most favorable to the nonmoving party.'"

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir.

2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the

evidence or to determine the truth of the matter; rather it is to determine whether

there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.  The proper inquiry of

the court "is the threshold inquiry of determining whether there is the need for a

trial—whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved

in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a

party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  Undisputed Material Facts.

A party who opposes a summary judgment motion must comply with Local Rule 56.1, which specifically provides that "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements" and that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Under this Rule, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed

admitted.  Further, a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Rather, "[o]nce the moving party has supplied sufficient affidavits in support of its motion, the opposing party must respond by supplementing the record in some manner— whether by its own affidavits or otherwise—setting forth specific facts demonstrating that there is a genuinely disputed factual issue for trial." *Id.*

The defendants filed a statement of material facts.  Kelly Bey, however, has not responded to the defendants' statement of material facts.  Thus, in accordance with Local Rule 56.1, the defendants' statements of facts are deemed admitted for purposes of the pending summary judgment motion.  As such, the following facts taken from the defendants' statement of material facts are undisputed.

### A.  The Defendants and Their Duties.

Defendant Keen is the Warden of the FCJ. *Doc. 23* at ¶1.  His duties are to supervise and direct the work and the staff required of the facility, to oversee the complete operations of the facility, and to develop and implement policies for the overall efficiency and orderliness of operations. *Id.*

Defendant Weller is the Deputy Warden for Inmate Services at the FCJ, and she reports directly to Warden Keen. *Id.* at ¶2.  Her duties include overseeing

9

services provided to the inmate population. *Id.* These services include treatment, religious, and medical services. *Id.*

Defendant Sterner-Lensbower is the Director of Treatment for the FCJ. *Id.* at ¶3. Her duties include overseeing case-management services provided to inmates and responding to grievances at the first level of the inmate grievance process. *Id.*

Defendant Burkholder is the sole chaplain employed by the FCJ, and his services are provided through Prison Ministries, Inc. *Id.* at ¶4. He oversees and delivers individual and group religious programming and counseling. *Id.* His specific duties include assuring equal status and protection for all recognized religions, developing a schedule of religious activities that provides for inmates of all religious denominations and disseminating that program, monitoring scheduled activities for content and suitability, providing counseling, providing advice on religious matters, maintaining connections with religious resources in the community, and being available to inmates regarding religious matters. *Id.*

### B. Kelly Bey's Incarceration and Religion.

Kelly Bey claims to be a Sunni Muslim/Moorish-American individual. *Id.* at ¶5. He was incarcerated at the FCJ in 2006. *Id.* More recently, Kelly Bey entered the FCJ in April of 2011, and remained there almost continuously until April of 2013. *Id.* Kelly Bey was re-incarcerated at the FCJ in May of 2013, and he

10

remained there until July of 2013, when he was transferred to SCI-Camp Hill after the Franklin County Court of Common Pleas sentenced him. *Id.*

According to Islamic law, food is either halal, "lawful," or haram, "forbidden." *Id.* at ¶6. Foods are halal unless they are explicitly forbidden. *Id.* Haram foods include the following: pork, pork-by-products, and pork-derivatives; all types of blood; meat of animals that have died naturally, that were killed by strangulation, a violent blow, or a headlong fall, that were partially eaten by scavengers, or that were sacrificed as an offering to idols; carnivorous animals, reptiles, and insects; and wine, ethyl alcohol, and spirits. *Id.* Pursuant to the teachings of the Moorish Science Temple of America, Moorish-Americans are not to consume pork or anything else that may be harmful to them, and they are not to consume alcohol or to use tobacco. *Id.* at ¶7.

Defendant Weller, as Deputy Warden of Inmate Services, has spent considerable time familiarizing herself with the practices of a variety of religions in order to properly provide for the religious needs of inmates at the FCJ. *Id.* at ¶8. She has also specifically familiarized herself with Islamic and Moorish-American religious practices. *Id.* When faced with inmate questions or requests on religious matters of which she lacks prior or detailed knowledge, Weller routinely contacts representatives of various religions with questions regarding their practices and procedures. *Id.* Weller also asks the requesting inmate to provide her a statement

of his reasons for requesting a particular item, diet, or alteration in current jail practice, both to allow her to validate any request and to correctly and specifically address the inmate's needs. *Id.* at ¶9.

### C. Diets Available at the FCJ.

The FCJ's policy provides for diets that conform to an inmate's religion:

> Inmates observing special religious dietary laws will be provided a diet, which meets the recommended daily allowance, as stated by the National Academy of Science, and which complies with the religious and dietary laws. The provision of such a diet must be consistent with the secure and orderly operation of the facility.

*Id.* at ¶17. The FCJ policy additionally provides:

> 5.3.1 Religious diets will be provided for inmates whose religious beliefs require the adherence to religious dietary laws.
> 5.3.2 Religious diets may be recommended by the Chaplain to the Deputy Warden of Inmate Services. The Deputy Warden of Inmate Services or designee will approve all religious diets.
> 5.3.3 The recommendation will include the reason for the request, the duration of the proposed change, and the proposed menu changes.
> 5.3.4 The burden of proof that the meal is an essential tenet of a sincerely held religious belief will be the responsibility of the requesting inmate.

*Id.* at ¶18.

The FCJ utilizes Trinity Services Group, Inc. to provide food services for inmates. *Id.* at ¶19. The FCJ provides general population inmates with a dietary plan ("General Population Meal Plan" or "General Plan"), which operates on a 4-week cycle and which comprises both meat and vegetarian items. *Id.* at ¶20. This

General Population Meal Plan has been approved by a Licensed Dietician-Nutritionist, who has affirmed that the meals provide a nutritionally adequate diet averaging 3000 calories per day, satisfying the Recommended Dietary Allowances for major nutrients required for adult males. *Id.*

The General Population Meal Plan does not contain pork, pork by-products, or pork derivatives, and contains no blood, no carnivorous animals, no reptiles, no insects, and no alcohol. *Id.* at ¶21. The General Plan comports with the guidelines for provision of a Muslim religious diet, as set forth by the United States Department of Justice. *Id.* Trinity Services Group, Inc. has assured the defendants that the General Plan comports with a Muslim religious diet. *Id.* at ¶22. Kitchen staff at the FCJ has also assured the defendants that the General Plan comports with a Muslim religious diet. *Id.* at ¶23.

The General Population Meal Plan was chosen after deliberation and consideration of the most cost-effective manner to satisfy the dietary needs of the broadest possible segment of the inmate population using a single meal plan. *Id.* at ¶30. The determination not to include any pork, pork by-products, or pork derivatives was a conscious choice given the prescription in several of the world's religions against the consumption of pork. *Id.* at ¶31. It was hoped that by removing all pork derivatives from the menu, and thus from the kitchen facilities at

the jail, the needs of the vast majority of the inmate population could be met via a single meal plan, with meals prepared inside the FCJ. *Id.*

The General Population Meal Plan reduces food service costs, simplifies meal preparation, and improves efficiency and security. *Id.* at ¶35.  Because there are no novel or unique ingredients that are served to some persons and not to others, use of the General Plan simplifies food preparation and increases efficiency. *Id.* at ¶32.  The General Plan also allows the Jail to service the dietary needs of inmates with only three full-time and one part-time kitchen staff members. *Id.*  Each meal prepared for the General Population Meal Plan costs approximately $1.18/tray. *Id.* at ¶33.  This single and encompassing meal plan also reduces the need for security checks for deliveries of kitchen supplies because the ingredients for the meals are the same and are all delivered at once, 17 times per month, from the same provider. *Id.* at ¶34.  Because all ingredients are delivered simultaneously from the same provider, the General Population Meal Plan reduces the number of staff necessary to conduct security checks of food deliveries and the frequency of such checks. *Id.*  As such, the General Population Meal Plan increases the security of the institution. *Id.*

The FCJ also offers a Vegetarian Meal Plan. *Id.* at ¶29.  Containing no meat whatsoever, the ingredients used in the Vegetarian Meal Plan include only foods which are halal: milk, honey, non-intoxicating plants, vegetables and fruits,

14

legumes, and grains. *Id.* The vegetarian diet accords with all recommended daily allowances, as set by the National Academy of Science, and it has been certified by a Licensed Dietician-Nutritionist as being fit for adult males. *Id.*

The FCJ also offers a Kosher Meal Plan for Jewish inmates. *Id.* at ¶36. Jewish inmates who observe kashrut law are placed on the Kosher Meal Plan, which consists of pre-packaged entrees prepared outside the FCJ that are delivered to the institution in double layered and sealed packaging. *Id.* at ¶36. The meals come with disposable utensils, and they accord with the extremely complex preparatory requirements of Jewish law. *Id.* The content of the Kosher meals is dictated by the provider. *Id.* Each Kosher meal costs $5.00. *Id.* The determination to purchase pre-packaged kosher meals was the most cost-effective means to provide for the dietary needs of Jewish inmates, given the prohibitive cost of creating and maintaining a kosher kitchen inside the FCJ. *Id.* at ¶37. Additional costs, including training on kosher law and cooking, procedures to prevent contamination of the kosher utensils and cooking implements, and the necessity of rabbinical inspections, were also considered. *Id.*

Because the General Population Meal Plan does not contain pork items, no special meals are required for inmates whose religious dietary rules prohibit the consumption of pork. *Id.* at ¶24. Other special religious diets may be requested in writing to the Deputy Warden of Inmate Services, or via the Chaplain, who

forwards such requests to the Deputy Warden. *Id.* at ¶ 25. The requests are validated by the Deputy Warden with members of the particular religious community, and if validated and approved, will be forwarded to the Food Service Manager. *Id.* Prior to any request for a religious diet being verified and approved, an inmate may ask to be placed on a Vegan Meal Plan or Vegetarian Meal Plan. *Id.* at ¶26. Indeed, any inmate may, for any reason, request the Vegan or Vegetarian Meal Plan, and such requests are always approved. *Id.* This is the sole accommodation offered to inmates pending approval of a special diet. *Id.*

Defendant Weller, who has taken considerable care to familiarize herself with religious practices of various sects represented in the FCJ, often asks inmates to provide a detailed statement of their reasons for making a special request. *Id.* at ¶27. Upon receiving a dietary request, Weller contacts members of the particular religious community of the requesting inmate to validate whether the request comports with the tenants of the inmate's particular faith group. *Id.* at ¶28. Weller also relies on her personal knowledge and various other reference materials. *Id.*

If the FCJ were required to provide a specific Halal Meal Plan, much of the benefits of the General Population Meal Plan would be removed, as multiple plans would need to be prepared in the FCJ kitchen. *Id.* at ¶38. This would complicate food service, require the hiring of more kitchen staff, and adversely affect efficiency. *Id.* at ¶38. Because the needs of Muslim inmates are satisfied by the

General Population Meal Plan, if a Halal Meal Plan were required, the FCJ would also need to provide a Buddhist Meal Plan, a Sikh Meal Plan, and other meal plans for various faiths, which are all now provided for by the General Population Meal Plan and/or Vegetarian/Vegan Meal Plans. *Id.* at ¶39.

A separate Halal Meal Plan containing meat also would be an enormous expense and would place a substantial strain on prison resources, impacting the ability of the FCJ to provide other services to inmates. *Id.* at ¶40.  The jail would be required to reduce the number of correctional officers employed, as well as reduce the rehabilitative and educational services provided to inmates, thereby affecting institutional order and the safety and security of remaining staff and the inmate population. *Id.*  The budget of the FCJ would be severely strained if the institution were required to separately provide halal meat for prisoners. *Id.* at ¶41. Additionally, more correctional officers would be needed to check the deliveries and maintain security, but the funds needed to purchase the meat would actually require a reduction in the number of staff employed by the jail. *Id.*

### D.  Kelly Bey's Requests and Grievances Regarding a Halal Diet.

At the end of August of 2012, Kelly Bey submitted a request slip asking whether the FCJ "serves hala [sic] meals" to Muslim inmates and stating that if it does not, then it should provide a kosher diet as that is the only diet that is "similar

to a hala [sic] diet . . . since it [is] a pork-free diet." *Id.* at ¶12.  Weller responded

by stating that the general meals were compliant as they contain no pork, no blood,

no carnivorous animals, and no alcohol. *Id.*  A couple of days later, Kelly-Bey

submitted another request slip stating that Weller had "misconstrued" his question,

asking whether the FCJ provides Muslim inmates with "special religious hala [sic]

diets," and again requesting kosher meals. *Id.* at ¶13.  Weller restated the position

that the meals at the FCJ were compliant with Islamic dietary requirements, and

wrote "[i]f you believe this is not in compliance, please explain why." *Id.*

At the end of September of 2012, Kelly Bey submitted a grievance

threatening civil action and stating that the jail was violating his civil rights by

failing to provide a halal menu. *Id.* at ¶14.  Defendant Sterner-Lensbower

responded that the grievance was unclear as to how Kelly Bey's religious needs

were not being met. *Id.*  Weller also responded that the meal plan was reviewed

and did not conflict with the essential tenants of Islam. *Id.*

In early October, Kelly Bey submitted another request slip, but rather than

providing details regarding why he felt the meals were not in compliance with his

religion, he simply requested a "hala [sic] diet that conforms to my religious faith

and practice." *Id.* at ¶15.  Stating that she had researched the matter, Weller replied

that the jail's meals did not violate Islam and that Kelly Bey could request the

vegetarian diet option. *Id.*  Kelly Bey submitted another request slip with regard to

the meal plan in July of 2013, to which Weller responded by stating again that the current menu is in compliance with a halal diet. *Id.* at ¶16.  Kelly Bey did not respond to Weller's requests for clarification. *Id.* at ¶43.  He also never requested the Vegetarian or Vegan Meal Plan. *Id.* at ¶44.

Following the filing of Kelly Bey's requests and grievance relating to halal meals, defendant Weller contacted Trinity Services Group, Inc. to confirm that the meal plan was compliant with Islamic dietary restrictions. *Id.* at ¶42.  The Trinity representative assured Weller that the General Population Meal Plan and Vegetarian/Vegan meal plans were in accord with Islamic law and practice. *Id.*

### E.  Religious Services at the FCJ.

The FCJ employs one full-time Chaplain to service the religious needs of the inmates at the facility. *Id.* at ¶46.  The Chaplain is provided through a contractual agreement with the United Churches of the Chambersburg Area, at a cost to the FCJ of $15,000.00 per year. *Id.*  Pursuant to FCJ policy, the qualifications for the Chaplain are set by the Warden, and the Chaplain is to assure equal status and protection for all recognized religions represented in the inmate population. *Id.* at ¶47.  The Chaplain is also responsible for maintaining a schedule of religious activities and worship services catering to all recognized religions represented in the inmate population and to disseminate that schedule. *Id.* at ¶48.

While the Chaplain provides religious counseling and services to all inmates if so requested regardless of religious affiliation, volunteer clergy from various denominations and affiliations visit the FCJ to provide services specifically to the adherents of their particular faiths. *Id.* at ¶49. The Deputy Warden for Inmate Services and the Chaplain both take requests from inmates regarding the need for clergy from a particular faith, and they make inquiries of organizations in the area representing such religion about whether an individual is willing to volunteer to come to the jail to provide services. *Id.* at ¶50.

Of the 416 inmates currently housed in the FCJ, 12 identify as Muslim and one specifically identifies as Sunni. *Id.* at ¶53. There is also one Buddhist inmate, one Satanist inmate, one German Baptist inmate, and one Wicca inmate. *Id.* The majority of inmates identify themselves as "Christian," without specification. *Id.* There are also Catholic inmates, Protestant inmates, Greek Orthodox inmates, Eastern Orthodox inmates, Jewish inmates, Mennonite inmates, Pentecostal inmates, Baptist inmates, Lutheran inmates, Mormon inmates, and Methodist inmates. *Id.* Other religious denominations have been represented in the inmate population in the past. *Id.*

Taleem is the urdu word for "education," and denotes a program of education including recitation and review of the Qur'an, the holy book of Islam, as well as of the Hadith and Sunnah, which are libraries cataloging the sayings and

doings of the Prophet Muhammad. *Id.* at ¶54.  During Taleem, the teachings of

Islam are discussed and meditated upon. *Id.*  "Jumu'ah" is a congregational prayer

held by Muslims every Friday, just after noon, involving a sermon, recitation of

traditional prayers, and a congregational prayer, which is traditionally led by an

Imam but may be led by an adult male member of the Islamic community. *Id.*  The

Jumu'ah is obligatory for Muslim men above the age of puberty, and it requires

that they pray in congregation either in a mosque or with a group of Muslims. *Id.*

At present, there is no volunteer Imam to provide religious services,

including leading Taleem studies or officiating Jumu'ah prayer, to Muslim

inmates. *Id.* at ¶51.  There is also no full-time Rabbi to service Jewish inmates,

Apostle to service Mormon inmates, Preacher to service Protestant inmates, Monk,

Lama, or Scholar to service Buddhist inmates of various sects, Brahmin to service

Hindu inmates, or Guru to service Sikh inmates. *Id.* at ¶52.  There is no full-time

Shia Muslim cleric. *Id.*  There is also no full-time cleric to service Eastern Rite

Catholic inmates, Asatru inmates, Native American inmates of various tribes,

Rastafarian inmates, Roman Catholic inmates, Eastern Orthodox inmates, or

Wiccan inmates. *Id.*

In 2004, the FCJ had an arrangement with an Imam, who had been referred

to the institution by the Islamic Society of Western Maryland. *Id.* at ¶55.  That

Imam was an unpaid volunteer, and he travelled from Maryland to the FCJ to

conduct Ju'muah services once per month and to lead prayer sessions during

Ramadan. *Id.*  But his visits stopped after the end of the Ramadan holiday in 2006,

when he travelled to the FCJ and found that no inmates wished to participate in

services. *Id.* at ¶56.  That Imam does not wish to return to the FCJ. *Id.*

Since 2006, FCJ officials have made inquiries with a variety of Islamic

societies and Mosques regarding a volunteer Imam, but they have been unable to

locate a volunteer. *Id.* at ¶57.  Many of the organizations and clerics contacted

desired compensation for their time and travel expenses, and the location of the

FCJ makes finding a volunteer difficult. *Id.*  Nevertheless, officials continue their

efforts to locate a volunteer. *Id.*  The FCJ simply does not have the financial

resources to compensate the clerics of religious organizations or sects to provide

religious services to inmates. *Id.* at ¶58.  Because of the limited budget, if the FCJ

were to compensate the clerics of various faiths, sects, and sub-sects for providing

religious services, it would be unable to provide other vital services to inmates, and

it would be required to reduce correctional officers and other vital staff, threatening

the good order of the institution. *Id.*

At present, Muslim inmates are accorded a space for their weekly use in the

FCJ Chapel to conduct inmate-led Taleem Studies, Jumu'ah Services, and other

Islamic religious functions and materials necessary to do so, and they are

supervised during worship by Chaplain Burkholder. *Id.* at ¶59.  The Chaplain has a

good knowledge of Islamic practice and a deep respect for all forms of religious faith. *Id.* at ¶60.  The Chaplain is present to supervise for security reasons. *Id.* at ¶61.  Inmates are also allowed to engage in daily individual prayer. *Id.* at ¶62.

The FCJ has a policy, which is strictly followed, of not requiring inmates to participate in religious services and of not favoring one type of service over another. *Id.* at ¶63.  The services of both the Chaplain and the volunteer clerics are to provide inmates the option, but do not oblige them, to follow their particular faith during their incarceration. *Id.*

While incarcerated at the FCJ in 2006, Kelly Bey submitted two request slips asking that Moorish-American Islamic services be held at the chapel and requesting that the facility obtain Moorish-American religious materials. *Id.* at ¶10. In August of 2011, Kelly Bey filed a grievance about the FCJ's failure to provide Muslim inmates an Imam to conduct services. *Id.* at ¶11.  In response, defendants Sterner-Lensbower, Weller, and Keen responded that the FCJ would welcome an Imam, that they had been attempting to procure one, but they could not locate any individual willing to volunteer. *Id.*

## V. Discussion.

### A. Kelly Bey's Claims for Declaratory and Injunctive Relief Are Moot.

The defendants argue that Kelly Bey's claims for declaratory and injunctive relief are moot. We agree.

Article III of the Constitution provides that the judicial power of the United States shall extend to "cases" and "controversies." U.S. Constitution, art. III, §2. "[F]ederal courts may adjudicate only actual, ongoing cases or controversies," *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990), and "[i]t is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" *United States v. Juvenile Male*, 131 S. Ct. 2860, 2864 (2011)(quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "Federal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013)(quoting *Lewis,* 494 U.S. at 477). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726-27 (2013)(quoting *Murphy v. Hunt,* 455 U.S. 478, 481 (1982)). Generally, an inmate's transfer from the facility complained of moots claims for

24

equitable and declaratory relief. *Sutton v. Rahseed,* 323 F.3d 236, 248 (3d Cir.

2003); *Johnson v. Wenerowicz,* 440 F. App'x. 60, 62 (3d Cir. 2011) (holding that

the prisoner's request for injunctive and declaratory relief against the named

defendants was rendered moot by his transfer to another prison).

In this case, since Kelly Bey is no longer incarcerated at the FCJ, his claims

for declaratory and injunctive relief are moot.  As such, it is recommended that

those claims be dismissed.


**B.  The RLUIPA Claims for Damages Against the Defendants in their Individual Capacities Should Be Dismissed, But the RLUIPA Claims for Damages Against the Defendants in their Official Capacities Should Not Be Dismissed.**

The defendants correctly contend that Kelly Bey's claims under RLUIPA

for damages against them in their individual capacities fail as a matter of law.

RLUIPA provides, in pertinent part, that "[n]o government shall impose a

substantial burden on the religious exercise of a person residing in or confined to

an institution" unless the government demonstrates that the burden furthers "a

compelling governmental interest" and "is the least restrictive means" of doing

so. 42 U.S.C. § 2000cc-1.  RLUIPA defines "government" to include States,

counties, municipalities, and other government entities created by the States as

well as officials of those entities and persons acting under color of State law. 42

U.S.C.A. § 2000cc-5.

"Congress enacted RLUIPA pursuant to its spending power under Article I of the Constitution." *Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir. 2012)(footnote omitted).  Reasoning that statutes enacted pursuant to the Spending Clause are contractual in nature, that only the contractual recipient of federal funds may be liable for damages for a violation of Spending Clause legislation, and that the government entity—not individual officials—are the recipients of federal funds under Spending Clause legislation, the Third Circuit held that individual officers sued in their individual capacities cannot be liable for damages for violations of the provisions of RLUIPA applicable to prisoners. *Id.* at 154-155.  Therefore, we recommend that the claims against the defendants in their individual capacities for damages under RLUIPA be dismissed.

The defendants also contend that the claims for damages against them in their official capacities are not cognizable under RLUIPA.  In support they cite *Sossamon v. Texas*, 131 S.Ct. 1651 (2011), and other cases dealing with RLUIPA claims against state officials.  It is well-settled that the Eleventh Amendment of the Constitution "provides unconsenting states with immunity from suits brought in federal courts by private parties." *Febres v. The Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d. Cir. 2006).  In *Sossamon,* the Court determined that "RLUIPA's authorization of 'appropriate relief against a government' § 2000cc-2(a), is not the unequivocal expression of state consent"

necessary to find that States waived their sovereign immunity from damages under RLUIPA by accepting federal funds. 131 S.Ct. 1658-60.  Thus, it held that RLUIPA does not allow an individual to sue a state for monetary damages. *Id.* at 1663.

Official-capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55 (1978).  In an official-capacity suit, the entity of which the officer is an agent is the real party in interest. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As such, claims against state officials in their official capacities for damages are treated as suits against the state and are barred by the Eleventh Amendment. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013). Accordingly, since RLUIPA does not provide for damages against a state, it follows that it also does not provide for damages against state officials in their official capacities. *See Banks v. Beard,* 3:CV-10-1480, 2013 WL 5465165, at *8 (M.D. Pa. Sept. 30, 2013).

In this case, there is no basis to find that the defendants are state officials or employees.  Rather, since they work at a county jail, it is reasonable to assume that they are county officials or employees.  Unlike States, "counties, municipalities, and political subdivisions of a state are not protected by the

Eleventh Amendment." *Jordan v. Cashman*, Civ.A.No. 11-1148, 2011 WL 2039170, at *7 (E.D. Pa. May 24, 2011); *Febres*, 445 F.3d at 229 (citing *Mt. Healthy City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274, 280 (1977), and *Bolden v. SEPTA*, 953 F.2d 807, 814 (3d Cir. 1991)).  Thus, an official capacity claim against the defendants is not barred by the Eleventh Amendment, and the cases cited by the defendants that hold that RLUIPA does not override the Eleventh Amendment immunity of a state or a state official sued in his or her official capacity from damages are inapposite. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 289-90 (5th Cir. 2012)(holding that while states may not be held liable for money damages under RLUIPA, municipalities and counties may).  Accordingly, we will not recommend that the RLUIPA claims for damages against the defendants in their official capacities be dismissed.  Instead, we will address those claims in the summary judgment context.

### C.  The Defendants Are Entitled to Summary Judgment.

The defendants contend that they are entitled to summary judgment as to Kelly Bey's claims based on his diet because Kelly Bey failed to exhaust administrative remedies as those claims, because those claims fail on the merits, and because they are entitled to qualified immunity.  They also claim that they are entitled to summary judgment as to Kelly Bey's claims based on the failure

to provide a full-time Sunni Muslim Imam because those claims fail on the

merits and because they are entitled to qualified immunity.

### 1. Failure to Exhaust Administrative Remedies as to the Diet Claims.

The Prison Litigation Reform Act requires a prisoner to exhaust available

administrative remedies prior to filing an action challenging prison conditions in

court.  The Act provides:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by a
> prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are
> exhausted.

In accordance with § 1997e(a), the exhaustion of available administrative

remedies is mandatory, *Booth v. Churner*, 532 U.S. 731, 739 (2001), and the

"exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

A prisoner must "exhaust all available administrative remedies" regardless of

whether the administrative process may provide the prisoner with the relief that he

is seeking. *Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000).  Failure to exhaust

available administrative remedies is an affirmative defense. *Jones v. Bock,* 549

U.S. 199, 216 (2007).  As an affirmative defense, the defendants have the burden

of pleading and proving that the prisoner failed to exhaust administrative remedies. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

42 U.S.C. § 1997e(a) requires proper exhaustion. *Woodford v. Ngo,* 548 U.S. 81 (2006).  In other words, it requires more than simple exhaustion, *i.e.*, more than that there is no further process available to the prisoner within the grievance system. *Spruill v. Gillis*, 372 F.3d 218, 227-31 (3d Cir. 2004).  Section 1997e(a) requires that a prisoner follow the procedural requirements set forth in the administrative remedy process that is available to him. *Id.* at 231.  The prison grievance procedures supply the yardstick for measuring whether exhaustion was proper. *Id. See also Jones,* 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

The defendants contend that Kelly Bey failed to exhaust administrative remedies because he failed to clarify why he believed the diets offered at the FCJ did not comply with his religion even though he was invited to provide such clarification during the administrative remedy process.  While the defendants acknowledge Kelly Bey may have completed the steps of the grievance process, they contend that he failed to comply with spirit and tenor of the exhaustion

process by continuing his request for a Halal diet without explaining why the diets offered did not satisfy his request.

"Proper exhaustion means using *all* of the steps the agency holds out." *Norwood v. Johnson*, 457 F. App'x 74, 77 (3d Cir. 2012)(emphasis in original). But it requires more than just using the steps provided.  It requires using the steps properly so that the agency has the opportunity to address the issue on the merits. *Jupiter v. Johnson*, 3:10-CV-01968, 2011 WL 4527791, at *6 (M.D. Pa. Sept. 28, 2011).  That may include "the unremarkable step of resubmitting a form the agency lost, or resubmitting a form to clarify for the agency the exact nature of one's claim." *Norwood*, 457 F. App'x at 77 (holding, in the context of a religious diet claim, that the plaintiff failed to exhaust administrative remedies because even though he followed the steps outlined for exhausting administrative remedies, he failed to comply with the spirit and tenor of the exhaustion requirements so as to allow prison officials an opportunity to resolve the claims); *see also Jupiter,* 2011 WL 4527791, *7 (holding that even though the prisoner completed each step in the administrative remedy process, he failed to exhaust administrative remedies because he failed to fill out the questionnaire about the diet he was requesting as he was instructed to do during the administrative remedy process).

In this case, in response to Kelly Bey's requests and grievance relating to a Halal diet, the defendants informed Kelly Bey that the diets offered by the FCJ complied with his request and they invited him to explain why he thought otherwise.  Kelly Bey never offered an explanation why the diets offered were insufficient.  Thus, he did not give the FCJ the opportunity to address the exact nature of his claim.  Accordingly, we conclude that Kelly Bey failed to properly exhaust administrative remedies as to his diet claims.

### 2.  The Merits.

In addition to being entitled to summary judgment as to the diet claims because Kelly Bey failed to exhaust administrative remedies, the defendants are entitled to summary as to the diet claims on the merits.  Further, they are entitled to summary judgment on the merits as to the claims based on the failure to provide a full-time Sunni Muslim Imam.

### a.  First Amendment Free Exercise Claims.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend. I.  "Inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise

of religion." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987)(citation

omitted).  But an inmate's First Amendment rights are necessarily limited by

legitimate penological objectives. *Sharp v. Johnson,* 669 F.3d 144, 155 (3d Cir.

2012).

In order to establish a Free Exercise Clause claim, the plaintiff must

establish that the defendants' actions contravene his sincere religious beliefs.

*Dehart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000).  "[W]hen a prison regulation

impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89

(1987).  The Court has identified several factors to consider when determining the

reasonableness of a regulation which impinges on a constitutional right, including:

(1) whether there is a "valid, rational connection" between the prison regulation

and the legitimate governmental interest put forth to justify it; (2) whether there are

alternative means of exercising the right that remain open to the prisoner; (3) the

impact that an accommodation of the asserted right will have on guards and other

inmates and on the allocation of prison resources generally; and (4) whether there

are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to

valid penological interests. *Id.* at 89-91.  "Although the *Turner* test was articulated

in the context of challenges to prison regulations, as opposed to challenges to

individual conduct, the analysis in the later context is the same." *Heleva v. Kramer*, 214 F.App'x 244, 247 (3d Cir. 2007).

The burden is on the prisoner to disprove the validity of the regulation or decision. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). "This burden is 'heavy' because plaintiffs must overcome the presumption that prison officials acted within their 'broad discretion.'" *Monroe v. Beard,* 536 F.3d 198, 207 (3d Cir. 2008) (quoting *Shaw v. Murphy,* 532 U.S. 223, 232 (2001)). While the ultimate burden of persuasion rests with the prisoner, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid penological interest. *Fontroy v. Beard,* 559 F.3d 173, 177 (3d Cir. 2009). "This burden is slight, and in certain instances, the connection may be a matter of common sense." *Sharp,* 669 F.3d at 156. "[T]his burden, though slight, must 'amount to more than a conclusory assertion.'" *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002)(quoting *Waterman v. Farmer*, 183 F.3d 208, 217 (3d Cir. 1999)). "Part of the court's inquiry under *Turner* is whether the government has satisfied this requirement." *Id.* If the government meets its burden, the court considers the other three *Turner* factors, and analysis of those factors is generally "fact-intensive." *Wolf,* 297 F.3d at 310.

### i. Diet Claims.

In this case, the defendants have presented evidence that the diets provided at the FCJ comply with Kelly Bey's religious requirements. Kelly Bey has not presented any evidence in opposition. Moreover, the defendants have presented reasons for why they structured their food service programs as they did—to improve efficiency and security and to contain costs. Those are legitimate penological interests. *See Smith v. Kyler,* 295 F.App'x 479, 481 (3d Cir. 2008)("The District Court correctly noted that the DOC has a legitimate interest in managing limited financial resources and in maintaining security."). And those interests are rationally connected to the way the FCJ structured its food service program. Thus, the defendants have satisfied their burden at the first step of the *Turner* analysis.

The second *Turner* factor requires a court to focus on the burden that the regulation imposes on an inmate's ability to exercise his religion. The court "must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." *Dehart v. Horn,* 227 F.3d 47, 55 (3d Cir. 2000). If alternative means of expressing his religious beliefs are available to the prisoner, that fact tends to support the conclusion that the regulation or decision at issue is reasonable. *Id.* at 57.

Here, Kelly Bey had alternate means of practicing his religion at the FCJ. The defendants have presented evidence, which Kelly Bey has not disputed, that inmates are allowed to engage in daily individual prayer and that Muslim inmates are accorded a space for their weekly use in the FCJ Chapel to conduct inmate-led Taleem Studies, Jumu'ah Services, and other Islamic religious functions and materials necessary to do so. Moreover, although Kelly Bey complains about the lack of an Imam, if he had identified an Iman who was willing to volunteer at the FCJ, there is no reason on the present record to assume that that Iman would not have been able to guide Kelly Bey and other Muslim inmates at the FCJ in religious services. Because Kelly Bey had alternative means of exercising his religious beliefs generally, the second *Turner* factor weighs in favor of finding the defendants' actions reasonable.

The third *Turner* factor analyzes the impact that an accommodation of the asserted right will have on guards and other inmates and on the allocation of prison resources generally. The fourth *Turner* factor is whether there are alternatives that fully accommodate the prisoner's rights at a *de minimis* cost to valid penological interests. "The third and fourth factors . . . focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for allocation of prison resources." *DeHart,* 227 F.3d at 57.

The defendants assert that requiring them to change their food service and provide specific diets for specific religions and sects would strain limited resources. This "could have a 'significant "ripple effect"' on prison resources." *Smith,* 295 F.App'x at 482 (quoting *Turner,* 482 U.S. at 90). If the FCJ had provided a special diet for Kelly Bey even though the diets it offered were designed to accommodate all or almost all religions, other inmates may have thought that the defendants were treating Kelly Bey more favorably than they treat other inmates, "a perception that could negatively affect prison morale and discipline." *Id.* And Kelly Bey has not identified any ready alternatives that would fully accommodate his rights at a *de minimis* cost. Thus, the third and fourth *Turner* factors weigh in favor of finding the defendants' actions reasonable.

In sum, the defendants have provided legitimate penolgical interests for their food service policies, which Kelly Bey has not disputed. Moreover, Kelly Bey has not presented any evidence as to the other *Turner* factors, and those factors weigh in favor of finding the defendants' actions reasonable. Accordingly, on the summary judgment record in this case, Kelly Bey has not met his burden of showing that the defendants' actions and policies violated his First Amendment right to the free exercise of his religion.

37

### ii. Sunni Muslim Imam.

The "opportunity to worship as a congregation by a substantial number of prisoners may be a basic religious experience and, therefore, a fundamental exercise of religion by a bona fide religious group." *Sharp,* 669 F.3d at 160 (quoting *Small v. Lehman,* 98 F.3d 762, 768 (3d Cir. 1996), *overruled in part on other grounds by City of Boerne v. Flores,* 521 U.S. 507 (1997)).  But not "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).  And "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.*  As Judge Aldisert said over 40 years ago:

> The requirement that a state interpose no unreasonable barriers to the free exercise of an inmate's religion cannot be equated with the suggestion that the state has an affirmative duty to provide, furnish, or supply every inmate with a clergyman or religious services of his choice.  It is one thing to provide facilities for worship and the opportunity for any clergy to visit the institution.  This may be rationalized on the basis that since society has removed the prisoner from the community where he could freely exercise his religion, it has an obligation to furnish or supply him with the opportunity to practice his faith during confinement. . . .
>
> But, to go further and suggest that the Free Exercise Clause demands that the state not only furnish the opportunity to practice, but also supply the clergyman, is a concept that dangerously approaches the jealously guarded frontiers of the Establishment Clause.

38

*Gittlemacker v. Prasse*, 428 F.2d 1, 4 (3d Cir. 1970). Thus, the First Amendment

does not require the state to furnish separate religious services for "a single

prisoner or a non-substantial number of like-minded prisoners." *Sharp,* 669 F.3d at

160 (holding prison officials entitled to qualified immunity on prisoner's First

Amendment claim based on the denial of separate religious services for the

Habashi sect of Sunni Islam and stating that "we have never indicated, let alone

clearly established, that a single prisoner or a non-substantial number of like-

minded prisoners are entitled to place on the state the burden of furnishing separate

religious services for them.").

Here, the defendants have presented evidence, which Kelly Bey has not

rebutted, that budgetary constraints allow only one full-time, paid Chaplain at the

FCJ. They have also presented evidence that volunteer clergy are allowed and that

they have sought an Imam, but currently are not able to find one willing to

volunteer his services at the jail. The defendants have presented legitimate

penological interests. *See Smith,* 295 F.App'x at 481. And those interests are

rationally connected to the FCJ's policy regarding religious services. *Id.* (holding

that DOC's policy to provide chaplains for only the largest faith groups and to

prohibit group worship unless headed by an approved, volunteer leader did not

violate Rastafarian inmate's free exercise rights). Thus, the defendants have

satisfied their burden at the first step of the *Turner* analysis.

As to the second *Turner* factor, *i.e.,* whether the prisoner had alternate means of practicing his religion, as set forth earlier it is undisputed that Kelly Bey had alternate means of practicing his religion at the FCJ.  Because Kelly Bey had alternative means of exercising his religious beliefs generally, the second *Turner* factor weighs in favor of finding the defendants' actions reasonable.

As to the third and fourth *Turner* factors, the defendants assert that requiring them to pay a Sunni Muslim Imam would hamper their ability to pay for other services and would likely result in layoffs of corrections officers.  Kelly Bey has not identified any ready alternatives that accommodate his rights at a *de minimis* cost to valid penological interests.  Thus, the third and fourth *Turner* factors weigh in favor of finding the defendants' actions reasonable.

In sum, the defendants have provided legitimate penolgical interests for their policy regarding religious leaders.  Kelly Bey has not presented any evidence as to the other *Turner* factors, and those factors weigh in favor of finding the defendants' actions reasonable.  Accordingly, on the summary judgment record in this case, Kelly Bey has not met his burden of showing that the defendants' policy regarding religious leaders violated his First Amendment right to the free exercise of his religion.

### b.  Equal Protection Claims.

The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.  The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192 (1964).  To assert a protected-class claim, the plaintiff must demonstrate that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir. 2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals").  Under this theory a plaintiff "must prove the existence of purposeful discrimination" by the defendants. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992).  Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v.*

41

*Olech,* 528 U.S. 562, 564 (2000).  This theory allows a plaintiff to assert an equal

protection claim regardless of protected class when the government irrationally

treats the plaintiff differently than similarly situated individuals. *Id.* at 564; *Hill v.*

*Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006).  To prevail on a class-of-

one claim, the plaintiff must demonstrate that: (1) the defendants treated him

differently from others similarly situated; (2) the defendants did so intentionally;

and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at

239.  Further, the *Turner* analysis is "equally applicable" to prisoners' equal

protection claims. *Williams v. Morton,*  343 F.3d 212, 221 (3d Cir. 2003).

     In this case, Kelly Bey has not presented evidence that similarly situated

prisoners of other faiths at the FCJ were treated differently than he was.  Nor has

he presented evidence that the defendants purposefully or intentionally

discriminated against him.  Thus, the defendants are entitled to summary judgment

on the equal protection claims.


### c.  First Amendment Establishment Claims.

     In his complaint, Kelly Bey also mentions the Establishment Clause, which

provides that "Congress shall make no law respecting an establishment of

religion." U.S. Const. amend. I.  The Establishment Clause " prohibits the

government from 'promot[ing] or affiliat[ing] itself with any religious doctrine or

organization, . . . discriminat[ing] among persons on the basis of their religious beliefs and practices, . . . delegat[ing] a governmental power to a religious institution, and . . . involv[ing] itself too deeply in such an institution's affairs.'" *Doe v. Indian River Sch. Dist.*, 653 F.3d 256, 269 (3d Cir. 2011)(quoting *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 590–91 (1989)). "The Supreme Court has set forth three tests for determining whether governmental action violates the Establishment Clause: the coercion test, the *Lemon* test, and the endorsement test." *Maier v. Pall*, 1:CV-09-1427, 2014 WL 1912194, at *15 (M.D. Pa. May 13, 2014).

In this case, Kelly Bey has not presented any evidence or argument under any of the Establishment Clause tests.  Accordingly, the defendants are entitled to summary judgment as to those claims.


### d.  Official Capacity RLUIPA Claims.

RLUIPA provides, in pertinent part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government demonstrates that the burden furthers "a compelling governmental interest" and "is the least restrictive means" of doing so. 42 U.S.C. § 2000cc-1.  RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of

43

religious belief." 42 U.S.C. § 2000cc-5(7).  RLUIPA provides that it "shall be

construed in favor of a broad protection of religious exercise, to the maximum

extent permitted by the terms of this Act and the Constitution." 42 U.S.C. §

2000cc-3(g).

In addition to establishing that he had a sincerely held religious belief, to

establish a claim under RLUIPA, a prisoner must establish that the prison's policy

or official practice substantially burdened the practice of his religion. *Washington

v. Klem,* 497 F.3d 272, 277-78 (3d Cir. 2007).  "For the purposes of RLUIPA, a

substantial burden exists where: 1) a follower is forced to choose between

following the precepts of his religion and forfeiting benefits otherwise generally

available to other inmates versus abandoning one of the precepts of his religion in

order to receive a benefit; or 2) the government puts substantial pressure on an

adherent to substantially modify his behavior and to violate his beliefs." *Id.* at 280.

Here, the defendants presented unrebutted evidence that the General Plan

and the Vegetarian Plan would have satisfied Kelly Bey's religious diet concerns.

Thus, Kelly Bey cannot establish that the defendants substantially burdened the

practice of his religion as to his diet.  Also, given the evidence presented, Kelly

Bey cannot establish that the defendants substantially burdened the practice of his

religion with regard to the provision of a religious leader.  He has not provided

evidence from which a reasonable factfinder could conclude that he was either

44

forced to abandon one of the precepts of his religion or that the defendants put substantial pressure on him to substantially modify his behavior and to violate his beliefs.  Accordingly, the defendants are entitled to summary judgment as to the RLUIPA claims for damages against them in their official capacities.

### 3. Qualified Immunity.

The defendants also contend that they are entitled to qualified immunity.  As set forth above, we conclude that the defendants are entitled to summary judgment on the merits of Kelly Bey's claims.  But even if that determination is incorrect, the defendants are entitled to qualified immunity from Kelly Bey's claim for damages.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

45

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  "If the law was clearly

established, the immunity defense ordinarily should fail, since a reasonably

competent public official should know the law governing his conduct." *Harlow,*

457 U.S. at 818-19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232.

One prong of the analysis is whether the facts that the plaintiff has alleged or

shown make out a violation of a constitutional right. *Id.*  The other prong of the

analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194,

201 (2001).  The court is permitted to exercise its discretion in deciding which of

the two prongs of the qualified-immunity analysis should be addressed first in light

of the circumstances of the particular case. *Pearson,* 555 U.S. at 236.  So it may

forego difficult constitutional issues and award qualified immunity to a defendant

if it is apparent that the defendant did not violate rights that were clearly

established at the time the defendant acted. *Id.*

The defendants are entitled to qualified immunity from an award of damages

because they did not violate rights that were clearly established at the time they

acted.  "The relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202.  "This is an

objective inquiry, to be decided by the court as a matter of law." *Doe v. Groody*,

361 F.3d 232, 238 (3d Cir. 2004). Because this inquiry focuses on the official's

actual situation, the analysis "must be undertaken in light of the specific context of

the case, not as a broad general proposition. . . ." *Montanez v. Thompson*, 603 F.3d

243, 251 (3d Cir. 2010) (quoting *Saucier,* 533 U.S. at 201). "This inquiry turns on

the 'objective legal reasonableness of the action, assessed in light of the legal rules

that were clearly established at the time it was taken.'" *Pearson,* 555 U.S. at 244

(quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)). "'If the law did not put the

officer on notice that his conduct would be clearly unlawful, summary judgment

based on qualified immunity is appropriate.'" *Bayer v. Monroe County Children &*

*Youth Services,* 577 F.3d 186, 193 (3d Cir. 2009)(quoting *Saucier,* 533 U.S. at

202). "In other words, 'existing precedent must have placed the statutory or

constitutional question beyond debate.'" *Reichle v. Howards,* 132 S.Ct. 2088, 2093

(2012)(quoting *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2083 (2011)).

Here, it was not clearly established at the time of the events in this case that

not providing a special Halal diet containing meat to an inmate violated the

inmate's rights. In fact, courts have held that not providing a Halal diet containing

meat does not violate an inmate's constitutional rights when there are other diet

options available to the prisoner. *See Williams v. Morton,* 343 F.3d 212, 220 (3d

Cir.2003) (holding that failure to provide diet containing Halal meats when

vegetarian diet available does not violate the First Amendment or equal

protection); *Adekoya v. Chertoff*, 431 F. App'x 85, 88 (3d Cir. 2011)("Likewise, we agree that Adekoya failed to allege an Equal Protection Clause violation. Although he explained that Jewish inmates at BCJ [Bergen County Jail] received kosher meals, he did not allege that these kosher meals contained meat or that they were appreciably different from the meals he was provided."); *Riley v. DeCarlo*, 532 F. App'x 23, 27 (3d Cir. 2013) (affirming grant of summary judgment to defendants on prisoner's claim that defendants violated his rights under the First Amendment's Free Exercise Clause,  the Fourteenth Amendment's Equal Protection Clause, and RLUIPA by not providing a Halal meat diet for Muslims). Thus, the defendants are entitled to qualified immunity from damages as to the diet claims.

The courts have also held that a prison does not need to provide religious leaders for any and every religious group in the prison no matter how few inmates are adherents to that religious.  Rather, courts have held that providing religious leaders for only the largest major faith groups does not violate a prisoner's rights. *See Smith v. Kyler*, 295 F. App'x at 481-82 (holding that the Department of Corrections' policy to provide Chaplains for only the largest major faith groups and to prohibit group worship without an approved, volunteer Faith Group Leader did not violate the First Amendment, RLUIPA, or the Equal Protection Clause).  In light of the case law, a reasonable official in the defendants' position would not

know that failing to provide a full-time Sunni Muslim Imam at the FCJ violated

Kelly Bey's constitutional rights.  Thus, the defendants are entitled to qualified

immunity from damages as to the claims based on the failure to provide a full-time

Sunni Muslim Imam.

## VI.  Recommendations.

Accordingly, for the foregoing reasons, it is recommended that the

defendants' motion (doc. 22) to dismiss and for summary judgment be granted.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within
fourteen (14) days after being served with a copy thereof.  Such party
shall file with the clerk of court, and serve on the magistrate judge and
all parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to
which objection is made and the basis for such objections.  The
briefing requirements set forth in Local Rule 72.2 shall apply.  A
judge shall make a de novo determination of those portions of the
report or specified proposed findings or recommendations to which
objection is made and may accept, reject, or modify, in whole or in
part, the findings or recommendations made by the magistrate judge.
The judge, however, need conduct a new hearing only in his or her
discretion or where required by law, and may consider the record
developed before the magistrate judge, making his or her own
determination on the basis of that record.  The judge may also receive

further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 29th day of May, 2014.

**_S/Susan E. Schwab_**
Susan E. Schwab
United States Magistrate Judge